# CATHOLIC UNIVERSITY OF AMERICA *v.* MORSE.

---

PRINCIPAL AND SURETY; FIDELITY BONDS.

1. In an action on a fidelity bond by the obligee against the sureties, evidence of acts of the plaintiff after his discovery of the alleged breach of trust of the principal, and tending to show a waiver by the plaintiff of any of the provisions of the bond, is admissible against him.

2. Where the treasurer of a university, who has given a bond to it conditioned upon the faithful accounting of money of the university coming into his hands for investment, loans the funds of the university to himself upon inadequate securities, he commits a breach of the condition of the bond; but if the university, after discovery of such breach, demands and receives from him such securities, treating them as its own, and takes from him additional securities, it adopts and ratifies his acts, and absolves the sureties on the bond from liability.

3. Where the obligee on a fidelity bond, after discovering that the principal obligor has committed a breach of the condition of the bond, without notice to the sureties enters into an agreement with him, by the terms of which it defers the collection of its claim against him until a time certain, and thus puts it beyond the power of the sureties to proceed against the principal obligor until the expiration of such period, the sureties are discharged; and under such circumstances the rule *strictissimi juris* will apply for the protection of the sureties.

No. 1905.   Submitted October 20, 1908.   Decided December 1, 1908.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on a verdict directed by the court, in an action against the sureties on a fidelity bond.                                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal [by the Catholic University of America, a corporation] from the supreme court of the District of Columbia in an action to charge the estate of Daniel B. Clarke, deceased, with liability for an alleged breach of a bond in the sum of $200,000, dated October 26, 1899, given by Thomas E. Waggaman as principal, and the said Daniel B. Clarke and John Lenthall Waggaman as sureties.

The conditions of the bond upon which the declaration counts are as follows: "That if said Thomas E. Waggaman shall well and truly account for and pay over to said University, or the proper officer thereof, all sums of money collected or received by him for or on behalf of said University; and shall safely keep, account for, and deliver up to said University all notes or other evidences of indebtedness belonging to said University, which shall be intrusted to him for safe-keeping, or for any other purpose, then this obligation to be null and void, otherwise to be and remain in full force and virtue in law."

Thomas E. Waggaman was appointed treasurer of the Catholic University of America, hereinafter alluded to as the University, in 1895. His duties as such treasurer as set forth in the by-laws of the University were as follows: "The treasurer shall receive all moneys paid to the University and belonging thereto, whether the same be capital or income, and shall duly receipt therefor. He shall securely invest, with the consent of the chancellor and the rector all capital to the best advantage, both as regards safety and profit, and shall apply the income to the promotion of the work of the University according to the directions which he may from time to time receive from the votes of this corporation. He shall give a bond in the sum of $200,000 for the faithful discharge of his duties, and

shall do such other acts as are or may be prescribed by the charter, the general constitution, or the by-laws."

Waggaman received from the University sums aggregating $876,168.96; but this case involves only $79,323.41, representing moneys received after the date of said bond. This sum Waggaman received at various times for investment, and in effect loaned it to himself,—a practice he seems to have followed in respect of all his investments for the University. Having been interested in large real-estate ventures, to the development of which this money appears to have been applied, he caused certain financially irresponsible employees in his office to execute notes made payable or indorsed to the University, the payment of which he guaranteed, which notes were secured on certain other collateral real-estate notes described by him as "List of Notes Numbered One." He sent statements to the University containing an account of the investments, his own name appearing, however, only as guarantor of the principal notes.

It does not appear that the University ever made any inquiries as to the identity of the signers of such notes, or as to the character or sufficiency of the security back of them. Sometime in the fall of 1903 the University, according to its answer in bankruptcy which forms a part of this record, called upon Waggaman "to deliver over the securities held by him in its behalf, to insure it against loss by reason of the investments so made," by him; and in response to the demands of the University Waggaman thereupon turned over certain collateral notes from said "List of Notes Numbered One," and on March 10, 1904, surrendered and delivered to the University principal notes of the face value of the full amount herein involved and representing moneys received by him after the date of the bond. On July 13, 1904, an agreement was entered into between Waggaman and the University. This agreement was admitted in evidence and recited that "whereas, from the report of the committee recently appointed by the party of the second part to investigate the investment of said 'University fund' and its condition, the said party of the second part is advised and informed that the said party of the first part has loaned the

said 'fund' to himself, giving, or causing to be given, as security therefor, certain promissory notes made and executed by employees in his office, made payable, or indorsed, to the Catholic University of America, hereinafter referred to as 'principal notes,' the payment of which is guaranteed by the party of the first part, and also secured on certain other or collateral notes described as 'real-estate notes, known as List of Notes numbered One,' the said principal notes being as follows." Here followed a list of notes including the ones involved in this suit. The agreement then recited that the only other security for the repayment of said University investment fund was the bond in suit and a bill of sale from Waggaman and his wife, conveying to the University the art gallery of Waggaman. The agreement further recited that the University "is not satisfied with the form and manner of the investment of its monies deposited with said Waggaman for investment, as above set forth, and is not satisfied with the security or securities given by said party of the first part, or obtained by him for and as security for said sum or funds, and has demanded of said party of the first part additional security for said sum or funds, and a definite arrangement as to the payment of said funds to the party of the second part; and whereas, said party of the first part is willing to arrange for said payment and to give additional security," etc.

It was then agreed "that said 'University fund' represented by said 'principal notes' shall be paid as follows: (a) The principal notes already due, being two in number, and aggregating in amount the sum of $80,000 to be paid on or before the fifteenth day of October, 1904, (b) the principal notes becoming due and payable after the date of this agreement, and before January 1, 1905, being nine in number, and aggregating in amount the sum of $275,170.39, to be paid on or before the first day of January, 1905. And (c) the balance of said principal notes, being twelve in number and aggregating in amount the sum of $570,988.57, to be paid on or before the date of their respective maturity, and as they fall due, the interest on the entire 'University fund,' represented by said

notes, to be paid, as heretofore, in monthly instalments." The agreement then provided for the giving of a deed of trust by Waggaman and John Ridout, trustees, of certain real estate as additional security. On July 25, 1904, such deed was given. In August, 1904, other creditors of Waggaman filed their petition in bankruptcy, to which petition the University filed answer, in which it averred that Waggaman was indebted to it in the sum of $876,168.96, "represented by certain notes fully described therein, which said promissory notes he guaranteed the payment of by an indorsement thereon." The trustee in bankruptcy subsequently filed a bill in equity against Waggaman and others, including the University, as creditors. In its answer the University under oath alleged, "that at various times from 1892 the said Thomas E. Waggaman, as treasurer of this defendant, had received various sums of money, aggregating the amount hereinbefore stated, for investment; that he had given the notes described in the deed of trust hereinbefore referred to, and had given a number of collateral notes security therefor; that he had informed this defendant repeatedly that said sums were being invested by him in the property in said bill described, and in said deed of trust included, and secured thereon by deeds of trust, and that the money itself was being expended by him in paying off encumbrances on said property, and in paying interest, taxes, and other expenses connected therewith," etc.

In another answer to a subsequent bill filed by said trustee the University averred that in the fall of 1903 the rector of the University, "finding that said Waggaman had in his possession all of the securities of the University, its notes and other evidences of loans made by said Waggaman, and all the papers relating thereto, and that the said bill of sale had not been recorded, recorded the bill of sale on November 28, 1903, and subsequently requested of and received from said Waggaman the notes, deeds of trust, and papers hereinbefore referred to."

Upon Waggaman being adjudged a bankrupt, the University presented itself as a creditor, and made the requisite proof of its claim against Waggaman, producing the promissory notes above mentioned as a part of its proof.

*Mr. John W. Yerkes, Mr. John J. Hamilton, Mr. George E. Hamilton,* and *Mr. Michael J. Colbert* for the appellant.

*Mr. Holmes Conrad* for the appellees.

Mr. Justice Robb delivered the opinion of the Court:

While there are several assignments of error, they are all embraced in two general propositions:    (1) That the court erred in receiving evidence of the acts of the University after its discovery of Waggaman's breach of trust, and (2) in directing a verdict for the defendants.

First: As the liability of the defendants was to be determined solely by the bond, it became very important to determine whether the University had waived any of its provisions, and hence the evidence objected to was pertinent and clearly admissible.

Second: An analysis of the bond upon which this suit is predicated clearly shows that two separate and distinct obligations were therein incurred. First, that Waggaman should account for and pay over to the University "all sums of money collected or received by him for or on behalf of said University;" and, second, that he should "safely keep, account for, and deliver up to said University all notes or other evidences of indebtedness belonging to said University," which should come into his hands.

The money here sought to be recovered was delivered to Waggaman *for investment;* consequently his sureties are not liable under the bond, unless it appears that Waggaman did not, in fact and in good faith, invest said money and duly account for and surrender the notes and other evidences of the loans, and that the University with knowledge of the facts, did not recognize and adopt such acts of Waggaman. If Waggaman did invest the money intrusted to him, and did surrender the evidences of the loans, neither he nor his sureties were liable under the bond in the event of disaster, for the bond did not attempt to guarantee the safety of the loans. It merely guaranteed that

money coming into Waggaman's hands for investment would be accounted for, which in this case meant that it would be invested in good faith, and not embezzled.

Loaning the funds of the University to himself upon inadequate security was not in good faith investing such funds, but if the University, with full knowledge of the facts, recognized and adopted such loans, it could not subsequently question Waggaman's authority to make them, for ratification was tantamount to original authority. Nor could the University repudiate the transactions in part and ratify them in part. *Rader* v. *Maddox* (*Teague* v. *Maddox*) 150 U. S. 128, 37 L. ed. 1025, 14 Sup. Ct. Rep. 46; Mechem, Agency, ¶ 130.

In the fall of 1903 the University demanded of Waggaman that he surrender the securities belonging to it which were in his keeping. In response Waggaman surrendered both the collateral real-estate notes and the principal notes. The University, with full knowledge of the facts, retained both, and in all subsequent proceedings continued to treat both as its property. It is not denied that these notes were all the evidences of the loans which Waggaman had made.

We are impressed with the contention of appellees that when the University, under the conditions disclosed by the record, accepted and retained the notes and collateral security evidencing the loans, the making of which it now contends constituted a breach of trust, it absolved the sureties on the bond from further liability. Knowing all the facts, the University, instead of repudiating the acts of Waggaman constituting a breach of his bond, deliberately adopted another course, accepted and retained the notes, and obtained from Waggaman additional security that they would be paid. It thereby adopted and ratified his acts, and cannot now be heard to say that the loans were made without authority.

Moreover, after knowledge that Waggaman had committed a breach of trust constituting a breach of his bond, the University, without notice to the sureties, entered into the agreement of July 13, 1904, with Waggaman, under which it deferred the collection of its claim against him until a time certain. Only one

of the notes representing the amount here involved was then, due, but, prior to the agreement, the University, had it not ratified the loans, would have had the right to demand immediate payment of the entire amount. The agreement was made upon sufficient consideration, was binding upon the parties, and put it beyond the power of the sureties to proceed against Waggaman until the time limit fixed in the agreement had expired. Before the expiration of that time, Waggaman had been petitioned into bankruptcy.

It is a familiar rule that any contract between the principal and creditor, made upon sufficient consideration and without the consent of the surety, which extends the time of payment by the principal, discharges the surety. 27 Am. & Eng. Enc. Law, 2d ed. p. 499; Brandt, Suretyship, sec. 376; *Bank of United States* v. *Hatch,* 6 Pet. 250, 8 L. ed. 387; *Union Mut. L. Ins. Co.* v. *Hanford,* 143 U. S. 191, 36 L. ed. 120, 12 Sup. Ct. Rep. 437; *United States Fidelity & G. Co.* v. *Golden Pressed & Fire Brick Co.* 191 U. S. 423, 48 L. ed. 245, 24 Sup. Ct. Rep. 142.

Inasmuch as the present case involves the undertaking of ordinary guarantors, the rule of *strictissimi juris* should apply. The sureties guaranteed that Waggaman would, when called upon, account for the moneys intrusted to him. The University called upon him to account, and found him guilty of a breach of trust. Clearly, the sureties were entitled to be consulted before an arrangement materially affecting their interests was entered into. They were not consulted, and are now entitled to stand on the letter of the bond.

The judgment is affirmed, with costs.　　　　*Affirmed.*

Mr. Justice VAN ORSDEL concurs in the conclusion that the University relieved the bondsmen by extending the time of payment of the notes under the agreement of July 13, 1904.

On application of the appellant, a writ of error to the Supreme Court of the United States was allowed December 19, 1908.